Yolanda GOMEZ, Manuel Gomez, Maria Valadez–Gonzalez, Gerardo Velasquez, and Isabel Velasquez, Plaintiffs,

v.

The HOUSING AUTHORITY OF the CITY OF EL PASO and Edmund Carrera, in his capacity as Executive Director of the El Paso Housing Authority, et al., Defendants.

Civ. No. EP–91–CA–30.

United States District Court,
W.D. Texas,
El Paso Division.

Oct. 30, 1992.

Justo Fernandez–Gonzalez, Lisa J. Fitzgerald, El Paso Legal Aid Soc., El Paso, Tex., for plaintiffs Yolanda Gomez, Manuel Gomez, Maria Valadez–Gonzalez, Gerardo Velasquez and Isabel Velasquez.

Michael C. Crowley, El Paso, Tex., for defendants Housing Authority for City of El Paso, Edmund Carrera, Executive Director of El Paso Housing Authority, Carmen Leal, Myra Deckert, Rene Pena, Robert Ayoub, Tom Cardenas, Bd. Members in their capacity as Directors of El Paso Housing Authority and Pat Michael, in her capacity as Manager of El Paso Housing Authority.

Harold E. Brown, Jr., Sp. Asst. U.S Atty., El Paso, Tex., Arthur R. Goldberg, U.S. Dept. of Justice, Civ. Div., Raphael O. Gomez, Sanjay M. Bhambhani, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant Jack Kemp, Secretary of HUD, U.S. Dept. of Housing and Urban Development.

## MEMORANDUM OPINION AND ORDER

SPARKS, District Judge.

BE IT REMEMBERED on September 22 and 23, 1992, a nonjury trial in the above-styled and numbered cause was held before the Court. Having listened to the testimony of the parties and witnesses and the arguments of counsel, and having reviewed the file and exhibits presented during the trial, the Court finds that Plaintiffs have not proven by a preponderance of the evidence that any of the defendants violated Plaintiffs' rights under the United States Housing Act of 1937 (42 U.S.C. § 1437, *et seq.*) or under the Constitution of the United States, pursuant to 42 U.S.C. § 1983.

## I. BACKGROUND

Plaintiffs are low-income residents of El Paso, Texas, who seek housing from the Housing Authority of the City of El Paso ("the EPHA"). Specifically, Plaintiffs have asked this Court to (1) declare that defendants violated 42 U.S.C. § 1437p (de facto demolition); (2) declare that defendants breached the annual contribution contract ("ACC") between HUD and the EPHA; (3) declare that defendants have violated Plaintiffs' civil rights under Section 1983 and their constitutional due process rights; (4) and enter a preliminary and permanent injunction:

a. Enjoining the further de facto demolition, destruction and deterioration of the Housing Authority projects.

b. Mandating the immediate rehabilitation of all vacant units so that they be occupied by applicants for public housing.

c. Mandating the immediate rental of all vacant units upon the completion of their rehabilitation.

d. Mandating the immediate repair of all defective conditions in all occupied units.

e. Mandating that defendants comply with the requirements of 24 C.F.R. 960.211.

*Plaintiffs' First Amended Complaint* (July 19, 1991).

Plaintiffs filed this suit against the above-named defendants, the United States Department of Housing and Urban Development ("HUD"), and Jack L. Kemp, Secretary of HUD on January 24, 1991. Plaintiffs brought the suit as a class action, but on January 27, 1992, Judge Lucius D. Bunton denied the Plaintiffs' motion to certify the action as a class action. On February 21, 1992, Judge Bunton granted Defendants Kemp and HUD's motion to dismiss

for lack of standing because Plaintiffs failed to allege facts from which a reasonable fact finder could find those defendants had caused Plaintiffs injury or that any injury would be redressed if Plaintiffs' relief were granted. *See Gomez v. The Housing Auth. of the City of El Paso*, EP–91–CA–30–B (Order Feb. 21, 1992). Judge Bunton denied a motion for summary judgment by the remaining defendants on March 23, 1992. The case was reassigned to Judge Walter S. Smith on July 10, 1992, and reassigned back to Judge Bunton on July 29, 1992. Finally, on September 10, 1992, Judge Bunton transferred the case, by consent, to this Judge before whom the case was tried on September 22 and 23, 1992.

A. *The Gomezes and Their Contentions*

Plaintiffs Manuel Gomez and Yolanda Gomez are a husband and wife with eight children. At the time Plaintiffs filed their First Amended Complaint, on July 19, 1991, the Gomezes had seven children and resided in a three-bedroom apartment for which they paid $435.00 a month, including utilities. The Gomezes did not consider themselves in need of public housing when the lawsuit was filed nor did they desire this Court to award them public housing. Rather, they were initially motivated to participate in this lawsuit in order to help other potential applicants. At the time of trial, the Gomezes were residing in a house and paid $360.00 a month for rent and approximately $100.00 a month for utilities. However, in August, 1992, the Gomezes were informed that the owner of the house was going to sell the house at which time they would have to leave. Thus, the Gomezes now desire public housing.

Mrs. Gomez filed an EPHA application for a five-bedroom apartment in 1988 or 1989. About a year after she filed the application she began calling (6–7 times) the EPHA to determine her status on the waiting list. At the time, she and her family did not have a permanent place to live, but were living with friends or Mr. Gomez's mother.

One of the last times she called, an EPHA employee told Mrs. Gomez the application had been lost and could not locate it after looking for it under Mrs. Gomez's name, her husband's name, and under both of their social security numbers. Mrs. Gomez was told to go to the EPHA office, which she did at least two weeks to a month later. At the office she spoke to an EPHA employee named Yolanda who also could not locate the missing application. The employee did not call a supervisor, did not reinstate Mrs. Gomez on the waiting list, and did not allow Mrs. Gomez to file a new application because the waiting list was closed. Mrs. Gomez was told to call back at the first of the month to check if the list for five-bedroom apartments would be open for that month. Mrs. Gomez has not called or attempted to file an application since that visit to the EPHA office, although the waiting list for five-bedroom apartments was open in March, September, and October 1990 and October 1991.[1]

B. *The Velasquezes and Their Contentions*

Isabel Velasquez and Gerardo Velasquez are a husband and wife with one three-year old child. Gerardo Velasquez has epilepsy and receives Social Security disability checks in the amount of $422 each month. The monthly disability check is the Velasquez's only source of income. For about a year prior to November 1990 the Velasquezes called the EPHA once or twice a month to inquire about housing. At the time, the Velasquezes were living in various places, including a trailer without windows, without running water, without a heater, and with a broken toilet.

On November 12 or 13, 1990, Mrs. Velasquez called the EPHA and informed the person with whom she spoke that her husband was disabled and that they had a small child. The EPHA employee told Mrs. Velasquez that the one-bedroom list was open and that they were giving preference

---

1. Neither Defendants nor Plaintiffs supplied the Court with information indicating whether or not waiting lists were open or not after November 1991.

to disabled persons. The Velasquezes were led to believe that their three-member family qualified for a one-bedroom apartment. Mrs. Velasquez, Mr. Velasquez, and Mr. Velasquez's sister went down to the EPHA office (on November 12 or 13, 1990) and filled out an application for a one-bedroom apartment and turned it in to a woman employee. Both Mr. and Mrs. Velasquez testified that a second woman employee then came in and told Mrs. Velasquez that the Velasquezes did not qualify for a one-bedroom apartment, although the woman knew Mrs. Velasquez had a disabled husband and a young child under five-years old, and tore up the application. The Velasquezes were not allowed to reapply for a two-bedroom apartment at that time because the two-bedroom list was closed, but were told to keep calling to check on the status of the two-bedroom waiting list.[2]

After November 12 or 13, 1990, the Velasquezes did not go to the EPHA office in person again until June or July of 1992 when they successfully filed an application for a two-bedroom apartment. Between November 1990 and November 1991 the two-bedroom waiting list was only open once, during the month of March 1991.

### C. *Ms. Valadez–Gonzalez and Her Contentions*

Plaintiff Maria Valadez–Gonzalez did not appear or testify at trial. According to her deposition testimony, Ms. Valadez–Gonzalez has not yet applied with the EPHA, but calls each month to inquire about the status of the two-bedroom waiting list. With no further information, the Court has no basis from which to discern whether or not Ms. Valadez–Gonzalez's rights have been violated or whether or not she has been damaged and thus, as a matter of law, finds she is entitled to no relief in this lawsuit.

### D. *The Defendants*

Defendant EPHA is a public housing agency authorized to develop and operate low-income housing under the United States Housing Act of 1937. *See* 42 U.S.C. § 1437a(6) (West 1992 Supp.). Defendant Edmund Carrera is the Executive Director of the EPHA and is sued in his official capacity. Defendants Rodolfo Hernandez, Blanche Darley, Margarito Rodriguez, Ellie Fenton, and Rene Pena are members of the EPHA's five-member board, appointed by the Mayor of the City of El Paso, and are sued in their capacity as Directors of the EPHA.[3] Pat Michael is Eligibility Officer of the EPHA and is sued in her capacity as "manager" of the EPHA.

The EPHA is one of 31 large PHAs nationwide out of approximately 725 PHAs total. EPHA operates approximately 6000 units and maintains a waiting list with approximately 2000 families on it at a given time.[4] The waiting list is organized by the number of bedrooms and by whether or not the applicant claims a Federal preference. In El Paso, families wait, on average, approximately three years[5] for housing once they have submitted an application.

---

2. In November 1990, the evidence established that the one and two-bedroom apartment waiting lists were closed. In October 1990, the one-bedroom apartment waiting list was open for elderly families only. The Department of Housing and Urban Development ("HUD") includes families whose head or spouse is a disabled person in its definition of elderly families. 24 C.F.R. § 960.405. And, contrary to the testimony of Ms. Pat Michael, Eligibility Officer for the EPHA, the regulations do not distinguish between families considered elderly by virtue of a member's age and those considered elderly because of the disability of a member, but rather indicate that any family considered to be "elderly" must be given a preference for admission to projects for elderly families. 24 C.F.R. § 960.-407(a).

3. Plaintiffs originally sued EPHA Board Members Carmen Leal, Myrna Deckert, Robert Ayoub, Tom Cardenas, and Rene Pena. However, as of September 22, 1992, Leal, Deckert, Ayoub, and Cardenas were replaced by Hernandez, Darley, Rodriguez, and Fenton, respectively.

4. In addition to families with applications on file waiting for housing, there are approximately 1500 families already in public housing in El Paso who need to be transferred because their family size has increased or decreased.

5. According to Cathie Hughes, a housing management specialist for HUD, a three year wait is not unusual for a large PHA.

As a public housing agency, EPHA receives funds (approximately 30–40% of its operating expenses) from HUD each year pursuant to an annual contributions contract ("ACC") and pursuant to budgets which EPHA submits to HUD for approval each year. EPHA also receives separate funds from HUD for modernization of existing housing under the Public Housing Comprehensive Improvement Assistance Program ("CIAP"). *See* 24 C.F.R. § 968.-101, *et seq.* In return, EPHA is required to comply with Federal statutes and regulations promulgated by HUD and, in the case of the CIAP program, to comply with approved deadlines for modernization or submit proposed revisions for approval if necessary.

## II. PLAINTIFFS' CAUSES OF ACTION

In their First Amended Complaint, Plaintiffs assert three basic causes of action. First, Plaintiffs challenge the EPHA's application and Federal selection preference process and maintain that it is in violation of federal regulations. Second, Plaintiffs contend that EPHA has failed to maintain and properly manage its projects to the extent that hundreds of vacant units have become uninhabitable and have created a de facto demolition of these units in violation of 42 U.S.C. § 1437p. Third, Plaintiffs contend that the EPHA's alleged failure to maintain its projects and the de facto demolition resulting therefrom constitute a breach of the Annual Contribution Contract ("ACC"), under which Plaintiffs maintain they are intended beneficiaries.

### A. *EPHA Application and Federal Selection Preference Policy*

1. Plaintiffs' Right to Sue

■ Section 1437d, Title 42, United States Code, requires that

[e]very contract for contributions shall provide that—

.     .     .     .     .     .

(4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure the sound management practices will be followed in the operation of the project, including requirements pertaining to—

(A) ... the establishment of tenant selection criteria which—

(i) ... give preference to families that occupy substandard housing (including families that are homeless or living in a shelter for homeless families), are paying more than 50 percent of family income for rent, or are involuntarily displaced at the time they are seeking assistance under this Act....

42 U.S.C. § 1437d(c)(4) (West Supp.1992). Plaintiffs do not allege that the EPHA's annual contribution contract with HUD does not contain such a provision, as required by Section 1437d. Thus, in order to sue, Plaintiffs must either have a private cause of action to sue to enforce HUD regulations or be entitled to sue as third-party beneficiaries under the ACC between EPHA and HUD. There is support for allowing Plaintiffs to sue under either theory.

Section 1437d(c)(4) mandates that, under the ACC, a public housing authority comply with HUD regulations if and when established. Thus, once established, such regulations would have the force of law. *See* 42 U.S.C. § 1437d(c); *see also Brafman v. United States*, 384 F.2d 863, 866 (5th Cir. 1967) (tax regulations "reasonably adapted to carry out the intent of Congress" have force of law); *Gholston v. Housing Auth. of City of Montgomery*, 818 F.2d 776, 783–87 (11th Cir.1987) (plaintiffs could not sue housing authority for violating Section 1437d(c)(4) because during the times relevant to the lawsuit HUD had not yet adopted regulations implementing the preference provision). Assuming HUD's regulations concerning admission policies and preferences (24 C.F.R. §§ 960.201–960.409) are enforceable under Section 1983 to the same extent Section 1437d, the statute authorizing those regulations, is, the Court sees no reason to treat Section 1437d or those regulations any differently than Section 1437a or 1437p, which have been held to create privately enforceable federal

rights.[6] *See Wright v. Roanoke Redevelopment and Housing,* 479 U.S. 418, 432, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987) (1437a); *Henry Horner Mothers Guild v. Chicago Housing Auth.,* 780 F.Supp. 511, 515 (N.D.Ill.1991) (Section 1437p(d) creates an enforceable right against conduct resulting in "de facto" demolition of public housing); *Tinsley v. Kemp,* 750 F.Supp. 1001, 1009 (W.D.Mo.1990) (same); *but see Dessin v. Housing Auth. of City of Ft. Myers,* 783 F.Supp. 587, 590 (M.D.Fla.1990) (no private cause of action under Section 1437p for "de facto" demolition).

Furthermore, the Court also finds Plaintiffs are intended third-party beneficiaries under the ACC between HUD and EPHA. Citing Sections 101 and 201 of the ACC between the Chicago Housing Authority and HUD, which is identical to the ACC between EPHA and HUD, the court in *Henry Horner Mothers Guild v. Chicago Housing Auth.,* stated "[t]he terms of the contract thus communicate that the purpose of the contract is to benefit public housing tenants, as well as low-income families generally, who are applicants and *potential applicants* of public housing." *Henry Horner,* 780 F.Supp. at 516 (emphasis added). Although the plaintiffs in *Henry Horner* were tenants and not potential applicants, the sections of the ACC cited above and Section 206,[7] as well as 42 U.S.C. § 1437,[8] certainly indicate that the ACC and the regulations which must be complied with thereunder were intended to benefit not just those persons who are tenants or are applicants on the waiting list, but also those persons who have attempted,

but been unable, to get on the waiting list because of alleged violations of HUD regulations and the ACC. *See id.; see also Tinsley,* 750 F.Supp. at 1012.

**2. Section 1983: Policies and Injury**

■ In order to find the EPHA liable, Plaintiffs must show by a preponderance of the evidence that there existed a policy or custom by EPHA which violated HUD regulations regarding admissions and federal selection preferences or that Edmund Carrera or one of the Defendant EPHA Board Members was personally involved in such a violation, which would in turn cause EPHA to be liable as Mr. Carrera and the Board Members are policymakers for the EPHA. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–27, 108 S.Ct. 915, 924–26, 99 L.Ed.2d 107 (1988); Tex.Loc.Gov't Code Ann. § 392.051 (Vernon 1988). Any violation by Ms. Michael, however, would not cause the EPHA to be liable as "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the [housing authority]" unless an authorized policymaker approves the subordinate's decision and basis for the decision, which ratification would cause the housing authority to be liable for the decision. *Id.* at 127, 108 S.Ct. at 926.

Plaintiffs in this case presented no evidence that Mr. Carrera or any Board Member of the EPHA violated HUD regulations or ratified actions of an EPHA official or employee that amount to violations of HUD

---

**6.** Most of the specific regulations which Plaintiffs allege have been violated have all been in effect since at least July 13, 1988, which is within the relevant time period for this case. *See* 24 C.F.R. § 960.201–211. The regulations dealing with elderly families, which include families whose head or spouse is disabled, were adopted in May and June 1989, before the Velasquezes attempted to apply for a one-bedroom apartment in an elderly project. *See* 24 C.F.R. §§ 960.401–407.

**7.** Section 206 of the ACC requires the local housing authority to adopt, promulgate, and post, "for examination by prospective tenants, regulations establishing its admission policies [which] ... must be reasonable and give full consider-

ation to its public responsibility for rehousing displaced families...."

**8.** Section 1437 of Title 42, United States Code, states, in part:

It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit ... to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income....

42 U.S.C. § 1437 (West Supp.1992) ("lower income" was substituted in place of "low income" in 1981).

regulations regarding admissions and Federal preferences. Therefore, there must have existed a policy or practice, "so permanent and well settled as to constitute a 'custom or usage' with the force of law," by the EPHA which violated HUD regulations in order for this Court to grant the declaratory and injunctive relief Plaintiffs desire. *See id.*

In addition, Plaintiffs must demonstrate they have been injured by such violations before they may recover under Section 1983. *See* 42 U.S.C. § 1983. Furthermore, if Plaintiffs were not injured by the defendants' conduct or if a favorable decision by this Court will not "redress" the injuries suffered by Plaintiffs, as determined at the time the complaint was filed, then Plaintiffs will lack standing to sue at all. *See Lujan v. Defenders of Wildlife,* — U.S. —, —, — n. 4, 112 S.Ct. 2130, 2136, 2141 n. 4, 119 L.Ed.2d 351 (1992).

Even considering the fact that the Gomezes, who at the time they filed this suit were not in need of housing, have recently been told they would have to move and thus are again in need of housing, there is no injury to any of the Plaintiffs caused by the EPHA's policies or customs regarding admissions or Federal preferences or an EPHA policymaker and redressable by this Court.

With regard to the individually named defendants, who are all sued in their official capacities, although Plaintiffs in their First Amended Complaint requested the Court to declare that the defendants violated Plaintiffs' statutory, constitutional, and regulatory rights and requested an injunction "[m]andating that defendants comply with the requirements of 24 C.F.R. 960.211 [Federal selection preferences]," Plaintiffs' focus in their pretrial order and at trial was injunctive relief against the EPHA. Furthermore, Plaintiffs provided no evidence

of any violations by any of these defendants except Pat Michael, who is not a policymaker for the EPHA. While there is reason to believe Congress intended tenants, applicants, and even potential applicants to be able to sue PHAs for violating the Housing Act of 1937 and implementing regulations, there is no reason to believe Congress intended such plaintiffs to be able to sue individual, non-policymaking employees of a PHA for violations other than intentional violations of the Constitution.[9] However, even if a non-policymaking employee such as Ms. Michael could be sued for violating the Housing Act of 1937 and implementing federal regulations, as discussed later, Plaintiffs were not harmed by any alleged violations committed by Ms. Michael and, therefore, have no standing to sue. *See id.*

### 3. Federal Preferences

Federal regulations require that each public housing authority adopt and implement policies and procedures which give preference "to applicants who are otherwise eligible for assistance and who, at the time they are seeking housing assistance, are [1] involuntarily displaced, [2] living in substandard housing, or [3] paying more than 50 percent of family income for rent" [hereinafter referred to as "Federal preferences" collectively]. 24 C.F.R. § 960.-204(a), (b)(4) (1992). Applicants eligible for assistance and claiming a Federal preference may not be refused a place on the waiting list *unless* the PHA determines that there is an adequate pool of applicants likely to qualify for a Federal preference.[10] 24 C.F.R. § 960.207(b) (1992) (effective July 13, 1988). If there are more people than can be "served within a reasonable period of time," the PHA must close the waiting list. *HUD Handbook,* at § 2–3(a)(1)(c). There must be enough applicants to fill

---

**9.** Apparently, the issue has never before arisen. At least this Court found no case in which a plaintiff sued defendants other than a PHA, an executive director of a PHA, a board member of a PHA, HUD, or the Secretary of HUD in a case alleging violations of the Housing Act of 1937 and implementing federal regulations.

**10.** During the period of time relevant to this lawsuit, approximately July 1988 through November 1990, not more than ten percent of applicants could be applicants without a federal preference and be provided assistance prior to applicants with federal preferences. 42 U.S.C. § 1437d(c)(4); 24 C.F.R. § 960.211(b)(2)(i), (ii) (1992) (effective July 13, 1988).

expected vacancies for at least several months before the waiting list is closed. *Id.* at § 2–3(b)(3).

Also, "[b]efore executing a lease with an applicant who has been offered a unit on the basis of a Federal preference, the PHA must require the applicant to provide verification that he or she qualifies for a Federal preference ... by virtue of the applicant's *current* status." 24 C.F.R. § 960.211(c)(3) (1992) (emphasis added).

Plaintiffs complain that the Defendants failed to apply the federal selection preferences required under HUD regulations and that Defendants failed to provide them notice and opportunity for a meeting, which is required when a Federal preference is denied, in violation of the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiffs complain that the EPHA's practice of not verifying an applicant's Federal preference until approximately 30–60 days prior to being housed violates Section 960.211(c)(3). According to Plaintiffs, applicants without a preference are placed in front of applicants with preferences, causing the waiting list to be longer and closed more frequently and applicants with preferences to be housed later than they would be if EPHA complied with HUD regulations. Plaintiffs maintain that had EPHA screened for Federal preferences at the time of application, the Plaintiffs would have been able to submit applications ahead of many ineligible applicants. Plaintiffs also claim that the EPHA has been giving more weight to applicants displaced by the City in violation of HUD regulations.

Each of Plainiffs' arguments regarding EPHA's Federal preference policies fails. At the time this lawsuit was filed none of the Plaintiffs had filed applications with EPHA; therefore, they had no applications to be screened by EPHA at the time the applications were filed. As for their inability to obtain a place on the waiting list, there is no evidence that waiting to verify an applicant's Federal preference until 30–60 days before the EPHA estimates an apartment will be available for the applicant causes the waiting list to be longer or

applicants with Federal preferences to be housed later than they would be if the screening took place at the time the application was filed. Most applicants for public housing in El Paso who are still in need of housing by the time their verification interview takes place qualify for a Federal preference. Thirty to sixty days is plenty of time for the EPHA to evaluate several applicants should the first applicant they interview no longer qualify for a Federal preference. Plaintiffs provided no evidence whatsoever of any delay caused by this procedure.

Furthermore, HUD regulations provide for a second verification to take place if "such a long time has elapsed since verification as to make reverification desirable, or the PHA has reasonable grounds to believe that the applicant no longer qualifies for a Federal preference." 24 C.F.R. § 260.211(c)(4) (1992). Thus, in almost all instances in El Paso, where the average wait is approximately three years, if Federal preferences were verified at the time an applicant initially filed an application, a *second* verification before executing a lease would be necessary under HUD regulations. Finally, as Plaintiffs were never interviewed and told they did not qualify for a Federal preference, there were never determinations that they did not qualify for Federal preferences, and no right to a review was triggered. *See* 24 C.F.R. § 960.-211(k) (1992).

As for Plaintiffs' claim that EPHA violated HUD regulations by giving more weight to persons displaced by the City of El Paso, there is some evidence that in the past the EPHA gave persons displaced by the City of El Paso preference over other displaced persons. Pat Michael, eligibility officer of the EPHA from 1987 to 1991, testified that a "long time ago", in about 1986, HUD told the EPHA the EPHA was giving preference to persons displaced by the City and that they were not allowed to do so. Cathie Hughes, a housing management specialist for HUD, testified in her deposition (admitted into evidence) that she thought she remembered discussing the fact, during a HUD Comprehensive Management Review/Occupancy Audit conduct-

ed September 18–22, 1989, that the EPHA could give preference to persons with City inspector notices over other displaced persons so long as they codified the preference. However, there was no express finding in the report or any indication that corrective action was necessary.

Prior to July 13, 1988, when federal regulations implementing the Federal preferences became effective, PHA's were free to establish their own preferences, many of which were suggested in the Public Housing Occupancy Handbook issued by HUD in August 1987. *See Public Housing Occupancy Handbook*, at Sections 5–4 and 5–5 (HUD August 1987) ("HUD Handbook"); *see also* 24 C.F.R. § 960.211. After July 13, 1988, PHA's had discretion to rank persons with federal preferences by applying non-Federal preferences (e.g., person with Federal preference and meeting local residency preference has precedence over persons with only a Federal preference); to aggregate Federal preferences (e.g., two Federal preferences take precedence over one Federal preference); to rank Federal preferences (e.g., displaced persons have greater preference than persons who pay more than 50% of income for rent); or to rank Federal preference definitional elements (e.g., persons whose housing "has been declared unfit for habitation by an agency or unit of government ... take precedence over" other persons whose housing is substandard). 24 C.F.R. § 960.-211(b)(2)(iii). Thus, the EPHA's ranking of persons with Federal preferences displaced by the City over other persons with Federal preferences was permissible before and after July 13, 1988.

The only potential problem appears to have been that the EPHA may not have stated in writing that it was applying such a ranking of preferences. However, EPHA's written admission policies dated July 26, 1989, do state in writing that persons "displaced by City Code Enforcement activities in addition to one or more of the above [Federal preferences] ... take precedence over other applicants with a preference." *Statement of Policy Governing Admission to, and Continued Occupancy of, Lower–Income Public Housing Projects Owned and Operated by the Housing Authority of the City and County of El Paso, Texas,* § IV(E)(1)(c) (EPHA July 26, 1989).[11]

Thus, at best, the EPHA was applying a permissible preference, although not in writing, for some period of time prior to July 26, 1989. Plaintiffs have not demonstrated that such an unwritten policy prior to July 1989 caused the waiting list to be longer or the Plaintiffs to be unable to apply for or obtain public housing. Presumably such an unwritten policy would not have made the waiting list any longer or caused it to be closed earlier, but would simply have affected the order that housing was granted to persons with Federal preferences already on the waiting list.

Plaintiffs have not demonstrated any policy by EPHA which violates HUD regulations regarding Federal preferences or which has caused them to be denied a place on the waiting list for housing, a Federal preference, or public housing.

### 4. EPHA Application Process

Isabel and Gerardo Velasquez complain that an EPHA employee tore up their application for a one-bedroom apartment in an elderly housing project on November 12 or 13, 1990, after another EPHA employee told them preference was being given for disabled applicants and allowed them to fill out an application for a one-bedroom apartment. Yolanda and Manuel Gomez complain that about a year after they filed an application for a five-bedroom apartment in 1988 or 1989 the EPHA lost their application and did not reinstate their application

---

**11.** On January 21, 1992, EPHA published a revision of the Statement of Policy Governing Admission to, and Continued Occupancy of, Lower–Income Public Housing Projects Owned and Operated by the Housing Authority of the City and County of El Paso, Texas, which no longer contains the preference for persons displaced by the City. *See Statement of Policy Governing Admission to, and Continued Occupancy of, Lower–Income Public Housing Projects Owned and Operated by the Housing Authority of the City and County of El Paso, Texas,* § IV(E)(1)(c) (January 21, 1992).

or allow them to fill out a new application because the waiting list for five-bedroom apartments was closed at the time the application was discovered missing.

Plaintiffs claim that the Velasquezes should have been allowed to apply for a one-bedroom apartment in an elderly project because HUD allows an infant to share a bedroom with his or her parents and because a disabled person such as Mr. Velasquez is defined as an elderly person. They claim EPHA should have had a definition for "infant". Plaintiffs also contend that EPHA personnel had discretion to give out applications when the waiting list was closed in violation of HUD regulations.

The Court has no evidence but that the Velasquezes' application was torn up and the Gomezes' application was lost. However, Plaintiffs provided no evidence, nor did they even contend, that the EPHA had a policy or custom of tearing up or losing applications. The tearing up of the Velasquezes' application was an intentional act on the part of an individual employee for which the EPHA is not responsible. There is similarly no evidence that the loss of the Gomezes' application was anything but an inadvertent, at best negligent, occurrence for which no one is to blame. The Court was concerned with the response by the EPHA employee to the Gomezes' lost application. The Gomezes probably should have been allowed to fill out a new application and have it reinstated to the approximate position their lost application would have had on the waiting list, but again, there is

no evidence that the failure of the EPHA employee to do so was a result of an EPHA policy or custom or that it was ratified by an EPHA policymaker. In fact, the Gomezes conceded they did not attempt to talk to the employee's supervisor then or at any time prior to filing this lawsuit.

No statute or HUD regulation specifies the size bedroom an applicant is entitled to request on his or her application. *HUD Handbook*, at § 5–1(a)(1). The regulations do require a PHA to "adopt and implement policies and procedures employing standards and criteria for tenant selection which take into consideration the needs of individual families for public housing and the statutory purpose ..." and which are "specific and describe in detail the criteria, standards and preferences to be applied." 24 C.F.R. § 960.204(a), (d)(3) (1992).

HUD does, however, in its 1987 Occupancy Handbook, give PHAs quite a bit of guidance in how to set occupancy standards. HUD suggests PHAs consider "the age, sex, and relationship of family members" and "special needs or circumstances in the community." *HUD Handbook*, at § 5–1(b)(1)(a), (c). As an example, HUD further lists guidelines which other PHAs have used in setting their occupancy standards.[12]

EPHA has adopted some of these standards, including the chart for the minimum and maximum number of persons to be assigned to apartments according to the

---

**12.** Section 5–1(b) states, in part:

(2) Some PHAs have found the following guidelines to be helpful in setting their occupancy standards:
(a) Generally two persons per bedroom.
(b) Persons of different generations, persons of the opposite sex (other than spouses), and unrelated adults, should have separate bedrooms.

(c) Children of the same sex should share a bedroom.
(d) Children, with the *possible exception* of infants, should not share a bedroom with parents.
(e) Persons with verifiable medical needs or other extenuating circumstances should be provided a *larger* unit.
(3) Some PHAs have adopted the following table:

NUMBER OF BEDROOMS

| NUMBER OF BEDROOMS | NUMBER OF PERSONS | |
| --- | --- | --- |
| | MINIMUM | MAXIMUM |
| 0 | 1 | 1 |
| 1 | 1 | 2 |
| 2 | 2 | 4 |
| 3 | 4 | 6 |
| 4 | 6 | 8 |
| 5 | 8 | 10 |

*HUD Handbook,* at § 5–1(b)(2), (3) (emphasis added).

number of bedrooms, which provides for a minimum of one person and a maximum of two persons in a one-bedroom apartment, and including the following provision:

Generally, there will be no more than two persons per bedroom. The maximum number of persons per bedroom listed below *may* be exceeded to permit an infant to share a bedroom.

*EPHA Statement of Policy,* § V(C)(1)(a), (4) (1989 & 1992) (emphasis added). Thus, there is no federal regulation or even EPHA policy *requiring* that a couple with an infant be allowed to apply for a one-bedroom apartment. The only evidence that EPHA ever actually made such an exception for a couple with an infant is a January 1988 notice listing the size apartments for which applications could be placed in January 1988. The notice, published in English and Spanish in the newspaper and posted at the EPHA office, had written on it, in English and in receptionist Yolanda Santillan's handwriting, "couples can apply even w/a child under age 5." However, eligibility officer Pat Michael testified a definition of infant has never existed because they just count the number of people, i.e., the exception is never utilized. Thus, it appears that no official policy to allow couples with one child under the age of five to apply for one-bedrooms existed or, if it did, it does not exist now nor is there any evidence that it existed in November 1990 when the Velasquezes attempted, with their young daughter, to apply for a one-bedroom apartment. Since such a policy is merely permitted, not required, by HUD, the Court cannot find its lack of existence or the lack of a specific definition of "infant" to be a violation of HUD regulations.

■ The Plaintiffs are correct, however, that the Velasquezes qualified to live in a project set aside for elderly families. Con-

trary to Ms. Michael's testimony that a family which is defined as "elderly" because the head or spouse of a family is "disabled" qualifies for a financial deduction but not for housing in an elderly project, federal regulations do not make such a distinction. *See* 24 C.F.R. §§ 960.405, 960.407 (1992) (effective in 1989). Rather, if the head or spouse of a family, such as Mr. Velasquez, is disabled, the family must be given a preference in determining priority for admission into a project for elderly families no matter what the disabled person's age or whether or not the family has children. *See id.; HUD Handbook,* § 5–2(b)(2), (3).[13]

Nonetheless, the Velasquezes were not harmed by this error or even by the fact that they were not allowed to apply for a one-bedroom apartment. On the dates the Velasquezes say they attempted to file an application, November 12 or 13, 1990, the waiting list for one-bedroom apartments (regular and elderly) was closed, as was the waiting list for two-bedroom apartments (regular and elderly).

*Defendant's Exhibit H.*

Evidence that Ms. Michael may, on occasion, have accepted applications after the waiting list was closed does not change that result. EPHA receptionist Yolanda Santillan testified during her deposition, but denied at trial, that applications were accepted after the end of the month in which the waiting list was open, even though the waiting list for that size apartment might be officially closed at that time. Similarly, EPHA receptionist Elizabeth Bustamante testified during her deposition, but denied at trial, that, at the discretion of Ms. Michael, applications would either be accepted only until the end of the month or until the new list came out—usually about the tenth of the month. Ms. Michael denied that such a practice ever occurred.

---

**13.** Section 5–2 of HUD's Public Housing Occupancy Handbook states, in part:

(2) PHAs may not set a minimum age (like 50 or 55) for the admission of handicapped or disabled persons to projects for the elderly. (3) PHAs may not exclude elderly families with children from projects for the elderly having units of the appropriate size.

*HUD Handbook,* § 5–2(b). Although this handbook was issued in 1987, there have been no statutory or regulatory changes since that time which would require a change to the above sections.

Plaintiffs attempted to bolster this evidence by demonstrating that in the month of November 1990 applications were accepted on the first, fifth, thirteenth, fifteenth, and nineteenth, despite the fact the waiting list was closed for all size apartments that month, and that in the month of July 1990 five applications were accepted when the waiting list was closed. Plaintiffs information comes from computer printouts listing those dates as dates on which applications were filed. Ms. Michael, however, testified that when an applicant refuses a suitable apartment offered, the applicant is dropped to the bottom of the waiting list; thus, the new effective date of application would be the date on which the applicant made the refusal, which may or may not be a date when EPHA is otherwise accepting applications for apartments of that size. This explanation is consistent with EPHA's policies which, in 1990, stated:

> Applicants shall receive the one offer to a suitable unit (by size and type) that has been vacated the longest.... The applicant must accept the offered unit or be moved to the bottom of the Waiting List, with a new listing date being the *date of refusal.*

*EPHA Statement of Policy,* at § V(D)(2)(c) (July 26, 1989) (emphasis added).[14] Ms. Michael's explanation and EPHA's policy are also consistent with HUD's Occupancy Handbook, which suggests PHAs adopt one of two plans to handle an applicant's refusal of an offer of a suitable apartment. One suggested plan provides:

> If the applicant refuses [a suitable unit], the applicant's name goes to the bottom of the waiting list.

*HUD Handbook,* at § 5–7(a)(4)(a).

Even taking as true Santillan and Bustamante's deposition testimony that Ms. Michael sometimes extended the acceptance of applications for apartments into the next month when the waiting list was closed for that size apartment, that testimony only establishes that the waiting list would remain open until the next waiting list was published on approximately the tenth of the next month. The November 1990 waiting list became effective on November 12, 1990, a date on which the EPHA office was closed for Veteran's Day. *See Defendant's Exhibit H.* Thus, the earliest date the Velasquezes could have attempted to file their application was November 13, 1990, a date when even if the waiting list for one-bedroom elderly apartments had been left open until the November list became effective, the list would already have been closed and no applications received.[15] Moreover, as the evidence produced by Plaintiffs, at best, showed that approximately five applications were accepted per month when the waiting list was closed, the Court finds Plaintiffs were not prevented from filing applications or receiving housing as a result of Ms. Michael's violation, if any.

Furthermore, Ms. Michael is not a policymaker for the EPHA. Her practice of sometimes leaving the waiting list open until the next month's list became effective cannot be attributed to the EPHA as Plaintiffs have provided no evidence that Mr. Carrera or any EPHA Board Member was aware of, much less ratified or condoned, such a practice.

**B.  *De Facto Demolition***

**1.  Plaintiffs' Right to Sue**

■  In their complaint, Plaintiffs complain that EPHA has left vacant a high number of units with the intention of demolishing them and has failed to maintain and properly manage the projects causing "hundreds of vacant units to become uninhabitable," constituting a "de facto" demolition in violation of 42 U.S.C. § 1437p and 24 C.F.R. §§ 970.4—970.12 (1992). Plaintiffs want this Court to halt any proposed demolition until obsoleteness has been proven and order the EPHA to immediately

---

14. In 1992, the same section was changed slightly to omit the words "that has been vacated the longest," but otherwise remained the same. *EPHA Statement of Policy,* at § V(D)(2)(c) (January 21, 1992).

15. The waiting list for one-bedroom apartments for elderly and disabled families was open in October 1990.

rehabilitate and/or repair all vacant units and then rent them to applicants.

Section 1437p(d), Title 42, United States Code, states:

A PHA may not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining approval of the Secretary [of HUD]....

In turn, HUD may not approve an application for demolition unless the PHA's application was developed in consultation with tenants in the project where proposed demolition would take place and the project, or portion of the project to be demolished is

obsolete as to physical condition, location, or other factors, making it unusable for housing purposes and no reasonable program of modifications, in keeping with the Comprehensive Improvement Assistance Program (CIAP) regulations ... is feasible to return the project or portion of the project to useful life.

42 U.S.C. § 1437p(b)(1) (tenant consultation); 24 C.F.R. § 970.4 (same); 24 C.F.R. § 970.6 (obsoleteness).

Since the amendment of Section 1437p to add subsection (d), the majority of district courts to consider the issue have held that section and the accompanying legislative history [16] to mean Congress intended applicants of public housing to be able to maintain private causes of action against PHAs for de facto demolition of public housing. *See Henry Horner*, 780 F.Supp. at 515; *Tinsley*, 750 F.Supp. at 1009; *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 321 (D.Conn.1988); *but see Dessin*, 783 F.Supp. at 590 (decided before *Henry Horner*). As Plaintiffs complaint is, in part, that because of the EPHA's alleged de facto demolition of public housing in El Paso, less housing is available causing them to be unable to get on the waiting list, the Court can discern no reason why Plaintiffs (who are not on the waiting list or only obtained a place on the

waiting list in July of 1992) should be less entitled to sue than persons who were actually on the waiting list at the time this lawsuit was filed.

**2. Plaintiffs' Evidence of De Facto Demolition**

■ Plaintiffs have not produced evidence showing by a preponderance of the evidence that EPHA has a policy of allowing public housing units to deteriorate and/or stand vacant for excessively long periods of time resulting in a de facto demolition. The credible evidence presented at trial demonstrates that long-standing vacancies in EPHA projects have been due to either modernization under the CIAP program or plans to demolish units.

**a. *Vacancies Due to Proposed Demolition***

With regard to units left vacant for proposed demolition, Plaintiffs produced absolutely no evidence that such units became uninhabitable as a result of any action or inaction on the part of the EPHA. In the Kathy White Project, the EPHA has applied to HUD for the demolition of eighteen units which have bad foundations and have accordingly been left vacant pending demolition. Although the application has not yet been approved, Plaintiffs did not produce evidence questioning the need to demolish those units or the EPHA's compliance with HUD regulations regarding the application for demolition process. Furthermore, EPHA produced undisputed evidence that, as required, eighteen units have already been purchased, *see* 24 C.F.R. § 970.4(e); therefore, there are no less units available to Plaintiffs as a result of the proposed demolition at Kathy White.

The only other units left vacant as a result of proposed demolition were at the Salazar Project. Following complaints from residents living in building under a

---

**16.** The legislative history states, in part:

This provision is intended to correct an erroneous interpretation by the United States Court of Appeals for the D.C. Circuit in *Edwards v. District of Columbia* [821 F.2d 651 (D.C.Cir.1987) ] and shall be fully enforceable

by tenants of *and applicants* of the housing that is threatened.

H.R.Conf.Rep. No. 426, 100th Cong., 1st Sess. (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3458 (emphasis added).

newly built overpass, EPHA vacated those buildings as a result of the residents' complaints and in anticipation of demolition. The proposed demolition was abandoned and those buildings are now being prepared for rental. Again, Plaintiffs produced no evidence that EPHA purposefully allowed those units to become uninhabitable or violated HUD regulations. Rather, the evidence shows proposed demolition resulted from resident complaints, which if they had persisted and demolition been carried out would in all likelihood have caused the units to qualify as obsolete due to location under HUD regulations. *See* 24 C.F.R. § 970.6(a).

b. *Vacancies Due to Modernization Under CIAP*

Plaintiffs also did not produce evidence demonstrating that vacancies not resulting from proposed demolition were the result of any EPHA policy other than EPHA's policy to modernize projects under the Comprehensive Improvement Assistance Program ("CIAP"). Under CIAP, projects, or portions thereof, in need of restoration are to be modernized under comprehensive plans, which means individual units are not to be restored in a piecemeal fashion, but rather entire communities are to undergo modernization at one time. *See Public and Indian Housing Comprehensive Assistance Program Handbook* [hereinafter CIAP Handbook], § 1–3(d) (December 20, 1989); *see also* 24 C.F.R. § 968.203, § 968.-305. Thus, EPHA must either wait for units to be vacated naturally, until all units in a project in need of modernization are empty, or transfer residents to other units or other projects. Either way, unless substantial numbers of new units or scattered-site houses are purchased, some units must necessarily remain vacant for a period of time before modernization can take place.

Furthermore, HUD anticipates a three to five year implementation period for each modernization project. A schedule for implementation is submitted to HUD for a project by the PHA, and, once approved, may not be exceeded *"unless a time request has been approved [by HUD] or is pending."* Plaintiffs' Exhibit # 11 (Notice

from HUD to PHAs concerning "Comprehensive Improvement Assistance Program (CIAP)—Policies and Procedures for Termination of Modernization Projects Where All Funds Have Not Been Obligated, April 15, 1987); *see also CIAP Handbook,* at § 10–8(c); 24 C.F.R. § 968.320(e) (1992). Such revisions, extending or changing deadlines in the implementation schedule, are routine according to Rudolph Kuusisto, a HUD engineer who performs CIAP monitoring visits and reviews. *See Kuusisto Deposition,* at 21, 77. In addition, in 1992, HUD implemented new regulations which give large PHAs, such as the EPHA, considerably more flexibility in implementing the CIAP program, including timing. *See* 24 C.F.R. § 968.301; *see generally* 24 C.F.R. §§ 968.-301—968.345 (1992). Although not in effect before or at the time this lawsuit was filed, these new regulations indicate HUD considers large PHAs to have a greater need for flexibility in implementing the CIAP program.

At the Robinson Project, 45 units have been vacant since approximately 1989 and 12 since some time after April of 1991. Repairs were begun in November of 1991, and only approximately six to twelve units were finished as of January 1992 (at most a three year period). Plaintiffs consider this to be too long and want this Court to order repairs to be made immediately so these units can be rented to applicants. HUD, however, allows PHAs to take between three to five years to perform modernization of a project, provided the time schedule, including revisions thereto, has been approved. Plaintiffs provided no evidence that modernization at Robinson was to be completed sooner under a HUD-approved implementation schedule.

Yolanda Carpio, an assistant manager at the Salazar Project, testified sixty units at Salazar were vacated beginning in 1990 because, she was told, they were to be modernized. The modernization never took place, but instead regular maintenance and repainting was performed and the units were assigned "very quickly". Similarly, Herlinda Espinoza testified ten to twelve units at the Manchuca Project were vacated in 1990 for modernization, but in late

1991 families moved in to those units before modernization took place. Plaintiffs offered no evidence as to why modernization was not done at either Salazar or Manchuca or whether the failure to modernize violated HUD regulations or the ACC; therefore, the Court can find no violations took place. As Plaintiffs want this Court to order EPHA to repair and rent out vacant units as soon as possible, and these units are no longer vacant, the Court can discern no potential harm to Plaintiffs either.

Plaintiffs also presented, as evidence of mismanagement of the CIAP program, the fact that EPHA was denied its request for $11 million in CIAP funds for fiscal years 1990 and 1991, because it had accumulated $14 million in unspent CIAP funds which HUD concluded it could not spend in three years at its current average spending rate of $4 million per year. Again, though, there is no evidence that this denial of funds by HUD indicates that the EPHA was in violation of HUD regulations or the ACC or that this denial or EPHA's accumulation of $14 million in unspent CIAP funds caused excessive numbers of vacancies.

Not only did Plaintiffs provide no proof that the EPHA's implementation of the CIAP program has caused de facto demolition of any units, or otherwise violated HUD regulations, but Bill Canales, HUD's Director of Public Housing for Region VI (Texas, Oklahoma, Louisiana, Arkansas, and New Mexico), testified that although HUD has found the implementation of CIAP improper at some PHAs in the past, it has not found the EPHA's implementation of CIAP improper in the past five years.[17] According to Mr. Canales, EPHA has complied with all federal regulations with respect to the CIAP program. Furthermore, while August 1989 findings by HUD, made after a Modernization Monitoring Visit for EPHA's 1984, 1985, 1986,

1987, and 1988 CIAP programs, did indicate that at that time EPHA did not have a five-year plan for CIAP work and consequently did not know where it was going, amongst other findings, Rudolph Kuusisto testified that all those findings were cleared because EPHA complied with all of the recommendations or corrections. *See Kuusisto Deposition*, at 74–75; *see also CIAP Handbook*, § 10–17(a)(3), § 10–18, § 10–19 (HUD may terminate an approved modernization program or find the PHA in substantial breach of the ACC *if* the PHA is *unable to correct* an identified deficiency) (emphasis added).

### c. *Vacancies in General*

In addition to the evidence regarding specific projects described above, Plaintiffs generally contend that the rate of vacancies at EPHA is too high and is in violation of HUD regulations, which require a PHA's vacancy rate to be three percent or less.[18] *See* Exhibit H–1, at 2, attached to *Hughes Deposition* (admitted into evidence). Plaintiffs' expert witness, Professor Henry King, a professor at the University of Texas at El Paso, testified that, using a spread sheet to analyze EPHA computer printouts, he concluded that in May of 1991 there were 1491 vacancies (out of a total of 6000 units), of which only 31.84% were held vacant for modernization. When questioned, however, Professor King admitted that if one unit was vacant for two or more periods, each period of vacancy would be counted as a vacancy so that the 1491 vacancies does not mean 1491 units were vacant at one time. Thus, Plaintiffs have no evidence that EPHA's rate of vacancies exceeds HUD's permissible three percent rate.

Pat Michael testified HUD had not found that EPHA exceeded a three percent vacancy rate in the past four to six years. Edmund Carrera, EPHA Executive Director since 1986, testified HUD had never told

---

**17.** According to Mr. Canales, HUD Director of Public Housing for Region VI, HUD performs reviews of a PHA's modernization/CIAP program four times a year; a PHA's finances once a year; a PHA's general management once a year; and a PHA's emergency CIAP program once a year.

**18.** Units held vacant for modernization are not considered "vacant" by HUD when calculating a PHA's vacancy rate.

the EPHA it had a problem with high vacancies. The report generated from HUD's Comprehensive Management Review/Occupancy Audit of the EPHA, September 18–22, 1989, shows that EPHA had a 97% occupancy rate in compliance with HUD standards. Exhibit H–1, at 2, attached to *Hughes Deposition.*

Plaintiffs' evidence of a high vacancy rate is inconclusive and speculative at best. EPHA's evidence, on the other hand, is credible and consistent and reveals no high vacancy problem at EPHA.

### C. *Breach of the Annual Contribution Contract (ACC)*

Plaintiffs contend that EPHA has substantially breached the ACC[19] between EPHA and HUD as a result of violating the 1937 Housing Act, HUD regulations, and HUD standards as discussed above. In support, Plaintiffs cite EPHA's accumulation of $14 million in unobligated CIAP funds and HUD's resulting denial of further funding for the fiscal years 1990 and 1991. Plaintiffs also cite EPHA's alleged high number of vacancies and revisions of CIAP implementation plans.

While failure to timely obligate funds or implement CIAP plans may result in a substantial breach of an ACC, HUD makes the determination of what is or is not a substantial breach. Furthermore, revision of an implementation schedule is not in violation of HUD regulations or the ACC unless the revision is not approved by HUD. *See* Plaintiffs' Exhibit # 11 (Notice from HUD to PHAs concerning "Comprehensive Improvement Assistance Program (CIAP)— Policies and Procedures for Termination of Modernization Projects Where All Funds Have Not Been Obligated, April 15, 1987); *see also CIAP Handbook*, at § 10–8(c); 24 C.F.R. § 968.320(e) (1992); *Kuusisto Deposition*, at 21, 77; 24 C.F.R. § 968.320(e), § 968.325(c) (1992) (HUD approved comprehensive plan binding on HUD and PHA "until such time as the PHA submits, and HUD approves, an amendment to its

plan"). Plaintiffs have provided no evidence that revisions to any implementation schedules have been made without HUD approval.

In light of the Court's findings above that the defendants have not violated federal statutes, federal regulations, or HUD standards, and in light of Plaintiffs' failure to provide any other evidence of a breach of the ACC by the EPHA, the Court finds the defendants have not breached the ACC between the EPHA and HUD.

### III. CONCLUSION

Plaintiffs have not proven by a preponderance of the evidence that any of the defendants violated the 1937 Housing Act, HUD regulations regarding public housing, HUD standards, or the ACC between HUD and EPHA. The credible evidence at trial showed only that employees of the EPHA may have acted negligently in advising Plaintiffs and losing the Gomezes' application and that an EPHA employee Ms. Pat Michael, who is not a policymaker for the EPHA, may have violated EPHA's policy of not accepting applications past the end of the month during which newspaper notices and notices posted at the EPHA indicated the waiting list for various size apartments was open. Plaintiffs presented no evidence that EPHA had any policies which violated Congressional statutes or HUD regulations or standards regarding admissions, Federal preferences, demolition (de facto or otherwise) of public housing units, vacancy rates, or modernization of public housing under CIAP. Nor did Plaintiffs prove beyond a preponderance of the evidence that they were injured by the acts or omissions of any defendant.

The Court will enter a judgment in accordance with this opinion and holds that Plaintiffs take nothing in this action against Defendants EPHA, Edmund Carrera, Rodolfo Hernandez, Blanche Darley,

---

**19.** Recall the Court has already determined Plaintiffs can sue for breach of the ACC as third

party beneficiaries. *See* p. 1367, *supra.*

Margarito Rodriguez, Ellie Fenton, Rene Pena, and Pat Michael.