### HENRY HORNER MOTHERS GUILD, et al., Plaintiffs,

v.

### The CHICAGO HOUSING AUTHORITY, an Illinois Municipal Corporation; Vincent Lane, in his official capacity as Chairman, Board of Commissioners and Managing Director of CHA; The United States Department of Housing and Urban Development; (HUD) and Henry Cisneros, in his official capacity as Secretary of HUD, Defendants.

### No. 91 C 3316.

United States District Court, N.D. Illinois, E.D.

May 27, 1993.

---

William P. Wilen, Chicago, IL, David E. Haracz, Timothy Huizenga, Tammy Jo Lenzy, Barbara E. Richardson, Chicago, IL, for plaintiffs.

James J. Casey, Bradford T. Yaker, Fred J. Posont, Stacey L. Prange, Keck, Mahin & Cate, F. Willis Caruso, Gen. Counsel, Chicago Housing Authority, Chicago, IL, for defendants CHA and Vincent Lane.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, IL, Howard M. Schmeltzer, Asst. Gen. Counsel for Litigation, Barton Shapiro, Trial Atty., U.S. Dept. of Housing and Urban Development, for defendant HUD.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Plaintiffs filed a class action complaint in 1991 against the Chicago Housing Authority ("CHA"), Vincent Lane (as chairman of the CHA), the United States Department of Housing and Urban Development ("HUD"), and Henry Cisneros (as the secretary of HUD). The plaintiff class is composed of applicants for public housing and residents of three public housing developments, the Henry Horner Homes, Henry Horner Extension and Henry Horner Annex, referred to collectively as "Horner" or the "Horner developments." Plaintiffs allege that by failing to maintain the Horner developments, defendants have, in effect, demolished Horner in violation of 42 U.S.C. § 1437p of the United States Housing Act, the Annual Contributions Contract between the CHA and HUD, and the tenants' leases. Plaintiffs seek declaratory and injunctive relief against defendants. The injunctive relief sought includes an order prohibiting defendants from continuing to "demolish" Horner and requiring them to maintain reasonably full occupancy at the development, after, among other

things, making all the residential units there habitable.

The parties have filed cross-motions for summary judgment. For the reasons stated in this opinion the motions are denied.

## I. UNDISPUTED FACTS [1]

The Henry Horner Mothers Guild, a not-for-profit corporation established to improve living conditions at Horner, current tenants of various Horner buildings and applicants for public housing at the Horner developments sue the CHA and HUD and both agencies' top administrators—Vincent Lane and Henry Cisneros—in their official capacities. The CHA is a public housing agency that administers federally subsidized and assisted low-rent housing as authorized under the United States Housing Act of 1937. HUD is the federal agency charged with the administration and enforcement of federal laws, regulations and contracts relating to the operation, administration and maintenance of public housing programs.

## A. CHA Vacancy Rates and Comprehensive Occupancy Plans

The Horner developments, which are owned and operated by the CHA, consist of approximately 1775 units located on the West side of Chicago. In November 1981 the overall vacancy rate at Horner was 2.3%, or 40 units. The vacancy rate at Horner climbed steadily for almost ten years, peaking at about the time plaintiffs filed their complaint (in July 1991) at 49.3%, which translates to 868 vacant units. Of the nine other large highrise CHA developments with over 1,000 units, Cabrini had the next highest vacancy rate of 33.6%. The others ranged from 2.8% to 25.5%. When the vacancy rate at Horner reached 49.3% in June 1991, the vacancy rate for all of CHA's public housing was 17.3%. By July 1992, the vacancy rate at Horner had dropped to 44.8%, which was still the highest rate of vacancy among the ten largest CHA developments.

Periodically, the CHA submits to HUD for approval something called a Comprehensive Occupancy Plan ("COP"). The COP is supposed to specify the actions that the CHA is taking or intends to take to eliminate vacancies in public housing developments. The vacancy reduction strategy outlined in the CHA's 1989 COP sought to lower the CHA's overall vacancy rate by targeting for rehabilitation one high-rise development—Rockwell Gardens—and Senior Housing developments. As of December 1988 the vacancy rate at Rockwell Gardens and Senior Housing was 11.6% and 9.0%, respectively. Meanwhile, Horner was one of only two developments at which the CHA projected a loss of occupied units in 1989. In fact, out of the approximately 450 units the CHA projected to become vacant in 1989, about half were Horner units.

In April 1989 HUD's Regional Administrator, Gertrude Jordan, informed the CHA that her office had reviewed the 1989 COP and forwarded the plan to Headquarters for review. Ms. Jordan wrote that her office accepted the plan "with great reluctance ... because we do not feel that proper emphasis has been placed on vacancy reduction efforts." The Regional Administrator stated that unless the CHA "seize[d] the opportunity to reduce vacancies at an early time, the Authority will reach the point of no return." In addition, Ms. Jordan wrote that her office's acceptance of the 1989 COP "is conditioned on our understanding that the next COP submission will reflect a formidable increase in occupancy projected for the year 1990." In June 1989 the Regional Administrator notified the CHA that HUD had approved the 1989 COP.

The CHA submitted its next COP to Ms. Jordan in March 1990 and HUD Headquarters eventually approved it. The CHA's vacancy reduction strategy for family housing in 1990 was to target thirteen developments for 97% occupancy. The Horner developments was not among the thirteen targeted developments. The COP stated the CHA's intention to reduce vacancies by 988 units;

---

1. This recitation of the facts is by no means final. These are simply facts that the Court finds are not in dispute. There are many other assertions of fact, especially those put forward by the CHA, that are disputed. At trial, the parties will have an opportunity to prove facts currently in dispute.

2.3% of these (23 units) were Horner units. The COP also cited seven large family developments as having the highest vacancy rates. Horner was not mentioned although it had a higher rate of vacancy than any of the developments listed. Vacancies at Horner in 1990 did not decrease by twenty-three units as projected by the CHA. Instead, vacancies increased by sixty-eight units.

The CHA's 1991 COP, which HUD Headquarters approved, concentrated on reducing vacancies in family developments with vacancy rates of over 20%. The COP stated the CHA's intention to "bring on line" 1,150 vacant units in the Wells, Taylor, ABLA, Cabrini and Horner developments by the end of 1991. Of the 1,150 vacant units the CHA intended to bring on line, 349 were to be Horner units. The CHA assembled three vacancy reduction crews to accomplish this repair effort. The crews were to be disbursed from development to development until all repairs were completed. At the end of 1991 only 33 Horner units had been brought on line—316 fewer than projected in the 1991 COP.

The CHA submitted its 1992 COP to HUD in October 1991. The CHA planned to restore 1,675 units to occupancy. The 1992 vacancy reduction strategy focused on eight high-rise developments at which the CHA intended to restore 1,500 units. Of these 1,500 units, only 100 were located in the Horner developments. All of the other seven developments had lower vacancy rates than Horner, yet all but one were scheduled to have more units brought on line.[2]

The CHA twice revised its 1992 vacancy reduction strategy. The first revision lowered the number of units to be restored from 1,675 to 914. Under the second revised plan, HUD and the CHA agreed the CHA would reduce vacancies by 1,658 in family and senior developments and by 104 in other developments. Of the 1,658 units, 139 were to be located in the Horner developments.

## B. Annual Operating Subsidies

HUD provides annual operating subsidies to all public housing administrations. The amount of HUD's annual subsidy is determined by the difference between the housing authority's projected expenses and projected operating income, which is generated primarily by dwelling rental income. The more rent an authority collects, the greater its operating income and the smaller the amount of subsidy it receives from HUD to cover projected expenses. Unless the housing authority has a COP approved by HUD, the authority must use 97% as its projected occupancy percentage for computing its projected operating income. But with an approved COP, the authority can use as its projected occupancy percentage either its actual occupancy percentage or its yearly authority-wide occupancy goal that HUD approved in the COP, whichever is greater.

By approving the CHA's COPS in 1987–1991, HUD allowed the CHA to compute its projected operating income without using the 97% projected occupancy percentage. Instead, HUD permitted the CHA to use its actual occupancy percentages for computing its projected operating income in 1987 (87%) and 1988 (84%). For 1989, 1990 and 1991, HUD approved the CHA's use of its yearly authority-wide occupancy goals, which were 83%, 83% and 85%, respectively.

HUD rejected the CHA's request for a waiver of the 97% projected occupancy percentage requirement for 1992. In a letter to the CHA, HUD Assistant Secretary Schiff outlined HUD's reasons for the rejection. The letter stated that "operating subsidies should be used to support housing already occupied by low-income families, not to perpetuate long-term vacancies or provide extra subsidies to vacant units undergoing modernization." It also said that by allowing the CHA to include such vacant units in its operating subsidy calculations, HUD had already provided the CHA with an additional $33 million in operating subsidies between 1987

---

2. The following numbers represent the vacancy rates at the respective developments as of June 30, 1991, and the number of units within the developments that the CHA intended to bring on line: Wells (24.3%/150); Taylor A (19.7%/150); Taylor B (22.4%/112); ABLA (25.5%/478); Cabrini (33.6%/210); Washington Park (21.5%/250); Stateway Gardens (16.2%/50); Horner (49.-3%/100).

and 1991. The letter noted that HUD's previous waivers "ha[ve] shown to be an ineffective mechanism for stabilizing and reducing vacancy rates." [3]

The CHA appealed Assistant Secretary Schiff's decision, asking defendant Cisneros' predecessor, Jack Kemp, to allow the CHA to use the 84% projected occupancy percentage to calculate the 1992 operating subsidy. Eventually, the CHA and HUD reached an agreement under which the CHA could use an 87% projected occupancy percentage for the purpose of operating subsidy computation. HUD allowed the CHA to reduce the projected occupancy percentage by excluding from the computation three categories of vacant units: (1) those for which the CHA has applied for, but not received, modernization funding and on-schedule modernization units; (2) those that the CHA intended to restore to occupancy during 1992; and (3) those occupied under the CHA's Homeless Initiative Demonstration Program. The downward adjustment of the projected occupancy percentage resulted in an increase in the amount of operating subsidy the CHA would receive.

Under a revised plan submitted to HUD in September 1992, the CHA excluded 1,750 currently vacant units from the 97% projected occupancy percentage. These were units for which the CHA had applied for modernization funding, but which HUD did not have the resources to fund. About 25% of the 1,750 units were located at Horner. As of mid–1992, the CHA had never requested modernization funds from HUD for the Horner developments. Furthermore, as of September 1992 HUD had never approved any modernization funds for Horner. Since that time, however, the CHA has earmarked funds for repair and modernization at the Horner developments.

3. During the period that HUD granted waivers, the CHA's occupancy goal had actually dropped from 90% in 1987 to 84% six years later.

4. Defendants claim that many of these conditions are the result of vandalism as well as gang related, drug and other criminal activity. Plaintiffs respond that although such activities contribute to the deteriorated conditions at Horner, the conditions are also attributable to mismanagement and neglect. There is support in the record for both parties' assertions. Plaintiffs have the additional argument that mismanagement, mani-

## C. *Physical Condition of the Horner Developments*

The CHA has stated in its own written materials that "in the opinion of many residents, staff and housing activists," Horner "is the authority's most troubled development ...," and "one of the most distressed public housing properties in the nation." In January 1991 the conditions at Horner included: non-functioning elevators, darkened hallways, lobbies and stairwells, broken, boarded-up and leaking windows, broken trash chutes and common areas cluttered with refuse, missing exit, stairway and fire escape signs, broken or missing stairwell doors, defective stairwell handrails, treads and landings, presence of human and animal waste in public areas and open, vacant apartments, broken screen doors and windows, numerous vacant units and abandoned laundry rooms with open or missing doors. Many of the enumerated conditions violate the City of Chicago Building Code. In September 1992 these same conditions existed at Horner. [4]

Shortly after plaintiffs filed the complaint in this case, building inspectors from the City of Chicago, Department of Buildings, inspected the Horner developments and found 570 "dangerous and hazardous" ("D & H") violations of the Building Code. The City defines D & H violations as items in disrepair that pose an immediate danger of life and limb to CHA residents and Authority personnel. The inspectors found such violations in all 21 Horner buildings. After the inspection, the City filed 20 enforcement actions and one administrative proceeding against the CHA, seeking monetary and injunctive relief for the 570 D & H violations and 146 other violations of the Building Code. In February

fested in lack of security and access control, makes Horner fertile ground in which criminal activity can flourish. This argument has common sense appeal, but the Court cannot say with any degree of certainty that criminal activity at Horner would diminish significantly if the management problems cited by plaintiffs were eliminated. This is the kind of dispute that can best be resolved at trial, where witnesses can relate their firsthand experiences and put flesh on the bones of the paper record before the Court.

1992, the CHA entered into an Agreed Order of Consolidation and Stipulation with the City regarding the resolution of the code enforcement cases pending against the CHA under which it agreed to address the D & H violations cited by the City. Pursuant to the Agreed Order, the CHA targeted 914 vacant units for rehabilitation. Of the 914 targeted units, 2.2% are located in the Horner developments.

On October 18, 1991 and April 24, 1992, HUD personnel conducted unannounced inspections at two different buildings in the Horner developments. During the inspections, HUD personnel observed, among other things: broken windows, mice and roach infestation, exposed electrical wires, missing hallway doors, two inches of standing water in a basement and elevator code violations. Additionally, the CHA itself inspected 687 occupied units in all 21 buildings in the Horner developments to determine whether the units complied with HUD's Housing Quality Standards. Of the 687 units inspected, only 9 (1.3%) units were in compliance with HUD's requirements.

## D. *The Comprehensive Improvement Assistance Program*

The CHA receives funding through HUD for the modernization of public housing projects under the Comprehensive Improvement Assistance Program ("CIAP").[5] There are three variants of CIAP funding: Emergency Funding, Special Purpose Funding and Comprehensive Modernization Funding. The hallmark of the CIAP program was Comprehensive Modernization Funding, which goes toward renovation that adds significantly to the remaining economic life of the structure. Once CIAP funding is approved by HUD, a public housing authority must expend the funds within five years from the date of availability to avoid recapture by the federal government. The CHA has not suffered the recapture of CIAP funds since a 1986 recapture of funds granted in 1983.

Between 1983 and 1991, the aggregate CIAP funding approved by HUD for the CHA was approximately $337 million. Of this amount, the CHA had expended about

39% by September 1991. The CHA expended most of the funds for rehabilitation and improvement projects at the CHA's Lakefront properties, Taylor Homes, Rockwell and Wells. The amount of funding approved for the Horner developments during this same period is roughly $14 million; about 31% of the funds had been expended by September 1991. The CHA has expended additional CIAP funds at Horner during 1992.

In 1989, the CHA requested almost $48 million from HUD in its CIAP application. CIAP funds requested for expenditure at Horner in 1989—roughly $45,000—represent about 1% of the $48 million request. The CHA requested that 1% for the Horner Annex; no funds were requested for the Horner Homes or the Horner Extension.

Approximately $11 million of the CHA's request was for Comprehensive Modernization programs throughout the CHA. None of those funds were requested for Horner. About $850,000 of the 1989 CIAP request was for vacancy reduction programs at Cabrini Extension, which had a vacancy rate of 33%. About $1.9 million was for Comprehensive Modernization at LeClaire Extension, which had a vacancy rate of 3%. Approximately $4 million was for Comprehensive Modernization at Green Homes, with a 51% vacancy rate. The CHA did not request any funds in its 1989 CIAP application for vacancy reduction at Horner, though as of June 1991 the vacancy rate at the Horner extension was 71%. The 1989 CIAP did include a $2.9 million request for "Special Purpose Vacancy Reduction" programs at the Ida B. Wells developments, which as of June 1991 had an overall vacancy rate of 24.3%. The overall vacancy rate at Horner as of June 1991 was 49.3%, yet the CHA requested no "Special Purpose Vacancy Reduction" funds or funds for renovation of any units at Horner.

In 1990, the CHA requested more than $81 million from HUD in its CIAP application, about 8% of which was requested for the Horner developments. Of the $81 million requested, the CHA sought about $23 million

5. As of 1992, CIAP has been replaced by the    Comprehensive Grant Program.

for Comprehensive Modernization programs. Of this amount, the CHA requested approximately $2 million for Lakefront Properties, $10 million for the Washington Park Apartments, $11 million for the Wells Extension and no Comprehensive Modernization funding for Horner. As of June 1991, the Washington Park Apartments had a vacancy rate of 20.6% and the Wells Extension had a vacancy rate of 32%.

In its original 1991 CIAP application, the CHA requested over $218 million from HUD. Of this amount, about $3.6 million (or 1.7%) was sought for the Horner developments, $850,000 of which the CHA requested for vacancy reduction activities. (The CHA ultimately sought and received about $5 million in CIAP funds for Horner.) HUD reduced the CHA's overall CIAP funding for 1991 from $218 million to $108 million, but provided $400,000 in increased funding for vacancy reduction activities at Horner. This was the only time HUD provided for increased funding for the Horner developments.

From 1983 through September 1991, the CHA spent less CIAP funds at Horner per unit than it did at the other nine large high-rise developments consisting of over 1,000 units. This is so even though the vacancy rate at Horner as of June 1991 was substantially higher the vacancy rates existing at the other nine high-rise developments.[6]

**E. The Major Reconstruction of Obsolete Projects Program**

HUD makes grants to public housing authorities for the redesign, reconstruction or redevelopment of existing public housing projects under the Major Reconstruction of Obsolete Projects Program ("MROP"). In 1987, the CHA received about $11 million in MROP funding, none of which was expended at the Horner developments. In April 1989, defendant Lane requested from HUD over

$21 million in MROP funds for Lathrop Homes. At the time of the request, Lathrop Homes had a vacancy rate of 22%. In July 1990, defendant Lane requested $8.5 million in MROP funds for a building in Darrow Homes, a project that is part of the Ida B. Wells development. Defendant Lane's letter to HUD stated that the vacancy rate at Darrow Homes was 32%; however, the CHA report cited by plaintiffs in their statement of facts says the vacancy rate was 57%. Finally, in May 1991, defendant Lane again requested $8.5 million in MROP funds for Darrow Homes. Between 1987 and 1992 the CHA did not apply for MROP funds for the Horner developments.

**F. Operation Clean Sweep**

In September 1988, defendant Lane instituted a program called Operation Clean Sweep to secure the most crime-ridden high-rise developments. The CHA intended to implement the program by removing non-leaseholders, enclosing open elevator lobbies, installing permanent guards at building entrances, issuing ID cards for tenants and repairing vacant and occupied units. The CHA chose Rockwell for the first "sweep" because of its high crime rate. Between September 1988 and mid-April 1991 (shortly before plaintiffs filed suit), the CHA conducted sweeps in 34 buildings in the Rockwell, Ickes, Cabrini, Hilliard, Washington Park, Wells, Taylor, ABLA, and Stateway developments, but none were conducted at Horner. Thereafter, between late April of 1991 and January of 1992, the CHA swept 7 Horner buildings.

**G. The CHA's Post–Complaint Vacancy Reduction Proposals For Horner**

In July 1991, after plaintiffs filed their complaint, defendant Lane proposed to HUD

**6.** There is a persistent debate running through plaintiffs' and the CHA's respective statements of fact that the Court must address. The CHA makes several assertions concerning funds it has "requested" from HUD for Horner or that it has "designated" for expenditure at Horner. Of course, there is no guarantee HUD will approve the CHA's requests for funds. And, as plaintiffs correctly point out, designating funds for expenditure at a particular development is not the

same as actually spending the money there. The CHA can adjust the amount of funds allocated to a particular development and transfer the funds to another development. Plaintiffs have described instances in which the CHA has done just that. Thus, it is difficult for the Court to place much weight on the CHA's representations about fund requests and designations. The CHA's "plans" for expenditure at Horner are not relevant to the issues presented in this case.

Regional Administrator Jordan a "Five Point Improvement Plan" for Horner. Under the plan, the CHA proposed to spend $4.7 million in CIAP funds to "winterize" the four western high-rise buildings of the Extension, make masonry wall repairs, construct a new heating plant and relocate residents from the four western buildings to the three eastern buildings. Essentially, "winterization" means that the buildings are shut down. The building systems are shut off, entrances are locked, windows from the ground to the fourth floor are bricked over and windows above the fourth floor are enclosed with a plastic sealant. The plan made no mention of how long the "winterized" buildings would remain closed.[7]

HUD Regional Administrator Jordan rejected the Five Point Improvement Plan in August 1991. Jordan wrote defendant Lane in October 1991 requesting the CHA to submit additional plans to improve Horner. After receiving an interim response from the CHA in the fall of 1991, Jordan wrote defendant Lane on January 31, 1992 requesting a "workable improvement plan" for Horner within 30 days.

The CHA submitted to HUD a revised "Horner Improvement Plan" in March 1992. This "Ten Point Plan" involved all three Horner developments, would cost $7.3 million, had a "major thrust" of eliminating dangerous and hazardous conditions in occupied units, and would take 24 months to complete. Under the revised plan, the CHA proposed using about 10% of the 1991 Horner CIAP funds to "winterize" two Horner buildings. About a quarter of the $7.3 million to be spent under the Ten Point Plan was earmarked for vacancy reduction.

In an April 27, 1992 letter to defendant Lane, HUD Regional Administrator Jordan expressed her disapproval of the Ten Point Plan. Administrator Jordan wrote:

[w]e have been repeatedly told [by the CHA] that Horner has not been "short changed" when compared with expenditures at other properties of the Authority. However, we note that CHA has yet to expend any of the $4,000,000 in CIAP vacancy reduction funds which have been available for Horner since October, 1990, during which period occupancy at Horner has continued to plummet. Each time the representation is made that Horner is receiving an equitable level of funding, we have asked for documentation of your position.... Despite our repeated requests, you continue to fail to produce these materials. This inaction, coupled with the small amount of new funding assigned to Horner, casts doubt on your verbally expressed commitment to the betterment of conditions at Horner.

## H. *The Public Housing Drug Elimination Program*

HUD is authorized to make grants to public housing authorities under the Public Housing Drug Elimination Program. Under the program, HUD funds various efforts to improve security and eliminate illegal drug activity at public housing developments. In its 1991 application for funds under the Drug Elimination Program the CHA requested funding for drug elimination activities in four developments: ABLA, Stateway Gardens, Ida B. Wells and Rockwell Gardens. The CHA requested no funds for Horner in its 1991 application. The CHA added Horner and Ickes to the list of targeted properties in its 1992 application.

## I. *HUD's Rating of the CHA*

Since 1991, HUD has evaluated the performance of public housing authorities in major areas of management operations. Using standard criteria for all authorities in the country, HUD identifies management capabilities and deficiencies, recognizing high-performing authorities, and designating criteria for "troubled authorities" and those that are "troubled with respect to modernization."

---

7. The parties dispute the long term effect of winterization on the buildings. Plaintiffs claim that winterization is synonymous with permanent closure. The CHA says their intention is to bring winterized high-rises back on line as soon as funds are available "to rehabilitate and repair those structures." Implicit in the CHA's response to plaintiffs' fears is that the affected building are, at the least, closed indefinitely. There is no suggestion by the CHA, for example, that the "winterized" buildings will be re-opened when "winter" turns to spring.

Under this system of evaluation, HUD uses 20 separate criteria or "indicators" to evaluate an authority, including vacancies, modernization, unit turnaround, outstanding work orders, annual inspection and condition of units, correction of unit deficiencies, and tenant account receivables. In HUD's initial evaluation, the CHA received the lowest ranking of any housing authority in Illinois, was designated a troubled housing authority, and received a failing grade in eleven of the twenty categories used under the evaluation program. There is no information in the record concerning subsequent HUD evaluations of the CHA.

### J. *CHA's Maintenance Expenditures at Horner*

In 1989, 1990 and 1991, the CHA spent 8.3% of its authority-wide maintenance expenditures for the Horner developments. These expenditures placed Horner fourth highest among all CHA developments with regard to average monthly maintenance expenditures. The only developments that had higher maintenance expenditures were Taylor Homes, Cabrini and ABLA, all of which contain more units than Horner. In December 1991, HUD Regional Administrator Jordan wrote to defendant Lane concerning HUD's unannounced inspection of 1936 Washington, which occurred in October 1991. HUD inspectors found the work output of the maintenance staff to be unacceptable, with about ⅔ of the total work hours wasted. HUD concluded that Horner could not be effectively managed with such low staff production.

### K. *Annual Contributions Contract and Tenant's Leases*

The CHA and HUD are parties to an Annual Contributions Contract pursuant to which HUD makes annual contributions to the CHA. Among other things, the contract requires the CHA to (1) administer each housing development to promote serviceability, efficiency, economy and stability and to achieve the economic and social well being of the tenants, (2) provide decent, safe and sanitary dwellings, and (3) maintain each project in good repair, order and condition. More- over, the contract requires that to the extent a project or any part thereof becomes damaged or destroyed, the CHA shall reconstruct, restore or repair it. If the CHA determines that such reconstruction, restoration or repair shall not take place, the CHA must seek approval from HUD.

The relationship between the CHA and tenants of CHA buildings is governed by a CHA dwelling lease. The lease imposes certain obligations and responsibilities upon both the CHA and the tenants. Among other things, the lease provides that the CHA will maintain the premises in a decent, safe and sanitary condition, and keep buildings, facilities and common areas in a clean and safe condition.

### II. *SUMMARY JUDGMENT STANDARDS*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining the existence of any genuine issues of material fact, the court must draw all reasonable inferences in the light most favorable to the party opposing the motion. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). But we are not required to draw every conceivable inference from the record—only those inferences that are reasonable. *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 886 (7th Cir.1989). Moreover, it is the responsibility of the party opposing the motion for summary judgment to set forth specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(c); *see Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514.

## III. PLAINTIFFS' CLAIMS UNDER SECTION 1437p

■ Plaintiffs seek relief against both the CHA defendants and the HUD defendants under causes of action rooted in § 1437p of the United States Housing Act. In Count I, plaintiffs sue the CHA and defendant Lane under 42 U.S.C. § 1983 for violation of plaintiffs' rights under 42 U.S.C. § 1437p. In Count II, plaintiffs seek relief against HUD and Secretary Cisneros alleging a statutory claim for violation of plaintiffs' rights under § 1437p.

The Housing Act establishes conditions under which a public housing authority may demolish or dispose of existing public housing units. Section 1437p(d) provides that a public housing agency "shall not take any action to demolish or dispose of a public housing project without obtaining the approval of the Secretary and satisfying the conditions specified in subsections (a) and (b) of this section." 42 U.S.C. § 1437p(d). Subsection (a) requires a public housing authority to secure the approval of the Secretary of HUD before demolishing or disposing of the development. 42 U.S.C. § 1437p(a). Subsection (b) requires that the public housing authority consult with tenants and tenant councils who will be affected by the demolition or disposition, and to provide assistance and alternative units to any displaced tenants. 42 U.S.C. § 1437p(b).

This case is not about whether defendants have satisfied the conditions of 42 U.S.C. § 1437p(a) and (b). The CHA defendants have made no formal application to demolish or dispose of the Horner developments, so they have not even tried to meet the statutory conditions for demolition. Plaintiffs contend, however, that by failing to maintain Horner and allowing it to exist in a state of perpetual disrepair, defendants have, in effect, demolished Horner while skirting the need to comply with § 1437p(a) and (b). By their inaction defendants have, according to plaintiffs, accomplished the constructive or de facto demolition of the Horner developments.

Earlier in this litigation, in a case of first impression in this jurisdiction, this Court recognized de facto demolition as a viable cause of action under § 1437p. *Henry Horner Mothers Guild v. Chicago Hous. Auth.*, 780 F.Supp. 511, 514–15 (N.D.Ill.1991). *Accord Tinsley v. Kemp*, 750 F.Supp. 1001, 1008 (W.D.Mo.1990)); *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316, 320 (D.Conn.1988); *contra Dessin v. Housing Authority of Fort Meyers*, 783 F.Supp. 587 (M.D.Fla.1990). The Court agreed with plaintiffs that "conduct that destroys a project—in the sense that the housing units would no longer be habitable—is governed by § 1437p(d) regardless of whether such conduct is characterized as affirmative conduct or passive neglect." *Henry Horner*, 780 F.Supp. at 513. But the Court did not reach "the far more difficult problem of what would have to be proved to show de facto demolition." *Id.* at 515.

Plaintiffs have proposed a standard of proof for establishing liability for de facto demolition. Plaintiffs contend they may meet their burden by showing either that: (1) defendants took actions likely to result in either active or de facto demolition of Horner or (2) defendants in fact (de facto) "demolished" Horner, in whole or in part. Additionally, plaintiffs assert that they can establish de facto demolition by showing either that a substantial number of residential units are vacant or that a substantial number of units are not habitable.

The Court is not prepared to adopt plaintiffs' formulation of what must be proved to show de facto demolition. Nor is the Court ready to articulate its own standard of proof for establishing liability under § 1437p(d). De facto demolition has never before been proved. The cause of action was judicially recognized for the first time only a few years ago. It appears that only one other court has actually considered whether a de facto demolition had been proved, *see Gomez, et al. v. Housing Authority of the City of El Paso, et al.*, 805 F.Supp. 1363 (W.D.Tex.1992), and that case does not provide a real life example of what a de facto demolition might look like. The court in *Gomez* found that the plaintiffs failed to adduce sufficient evidence to prove de facto demolition—a determination the

court reached after the benefit of a trial.[8] A trial is necessary in this case too.

■ A genuine issue of material fact exists as to whether the Horner developments are demolished "in the sense that the housing units [are] no longer [ ] habitable," *Henry Horner*, 780 F.Supp. at 513, and if they are uninhabitable whether defendants' conduct caused the *de facto* demolition. Plaintiffs have presented the Court with certain indicia of uninhabitability. Vacancy rates at Horner are quite high, and the CHA's vacancy reduction strategies have not helped. But the Court will not rest its determination on vacancy rates alone, as plaintiffs suggest. It is, in the Court's view, too narrow a criterion on which to judge the habitability of a building. The physical conditions at the Horner developments may be deplorable, but on this record it is unclear whether the scores of code violations reported by plaintiffs translate to a demolished property. Nor can the Court say whether the physical conditions at Horner are worse than those that exist at the other public housing developments in Chicago. Under plaintiffs' theory of the case—that defendants chose to allocate insufficient funds to Horner and to not make necessary repairs—the conditions at Horner should be appreciably worse than at those developments that defendants have favored at Horner's expense.

Other indicia of uninhabitability include the relative paucity of funds defendants have allocated to Horner, especially in light of the soaring vacancy rates there. Of course, defendants' resources are not infinite and their properties are numerous. Some amount of discretion must be accorded these agencies when they make judgments about where to spend their limited funds.[9] Have defendants exercised their judgment in a manner that has, in effect, rendered Horner uninhabitable? And if defendants spent twice as much money at Horner as they are now spending, would conditions there be any different? These are unresolved questions of fact. Whether these facts are "material" depends on whether they are "outcome-determinative under applicable law." *Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991). The "applicable law" in this case is nascent. It does not provide a solid foundation for deciding this case on summary judgment. A trial on these issues will greatly assist the Court. A trial will also aid the Court in determining the physical conditions at Horner as they presently exist. The last physical inspection chronicled in plaintiffs' briefs occurred in the summer of 1992. What, if anything, has changed at Horner since then? Has the additional expenditure of CIAP funds in 1992 touted by defendants improved conditions at Horner? These questions warrant further investigation by trial.

■ Whatever the Court finds necessary to prove *de facto* demolition, that proof will not include a showing of intent to demolish. Section 1437p(d) obligates the CHA not to demolish public housing without first obtaining HUD's approval. If the statutory conditions for demolition are not satisfied and public housing is demolished, be it through design, neglect, incompetence or inadvertence, a violation of § 1437p(d) has occurred. This is not to say that evidence showing intent or supporting an inference of intent

8. The standard of proof applied by the court in *Gomez* can be stated as follows: in order to prove *de facto* demolition, the plaintiff must show by a preponderance of the evidence that the defendant "has a policy of allowing public housing units to deteriorate and/or stand vacant for excessively long periods of time," and that the defendant's policy caused the *de facto* demolition. *Gomez*, 805 F.Supp. at 1375. Requiring the plaintiff to show the defendant "has a policy" is tantamount to requiring the plaintiff to prove intent. As discussed *infra*, this Court does not agree with *Gomez* in this regard.

9. Although the CHA defendants must exercise discretion in carrying out their duties, that does not place the CHA beyond the purview of this Court. Contrary to the CHA's assertions, the state law that created the CHA does not insulate it from "judicial interference." As plaintiffs correctly note, that very statute, the Illinois Housing Authorities Act, says the CHA must exercise its discretion in accordance with the provisions of the United States Housing Act of 1937, of which § 1437p(d) is a part. *See* Ill.Rev.Stat. ch. 67½, ¶ 24. When a genuine issue exists as to whether the CHA has, in violation of § 1437p(d), taken action to demolish public housing without meeting the prerequisites outlined in § 1437p(a) and (b), this Court must decide whether the CHA has violated the law. This case presents precisely that issue.

will not be entertained by the Court. But there is nothing in the language or legislative history of § 1437p(d) that compels the conclusion that intent is a necessary element of a claim under that section. *See Henry Horner,* 780 F.Supp. at 513–15 (discussing legislative history of § 1437p(d)).[10]

The Court's conclusion that intent to demolish is not essential to an action for *de facto* demolition disposes of the HUD defendants' suggestion that the provisions of § 1437p are triggered only after the CHA actually decides to demolish public housing. And HUD's argument that it has no duty to stop a public housing authority from violating § 1437p(d) fares no better. HUD's enforcement obligation is created through the same statutory scheme that charges HUD with administering, funding and monitoring public housing agencies. 42 U.S.C. § 1437p. Under that statutory scheme, HUD must approve in advance any action to demolish public housing. § 1437p(d). Although the statute does not expressly say so, the Court finds HUD's duty to enforce the statute is triggered when action to demolish is taken without HUD's approval. Any other interpretation would leave the section without a governmental mechanism of enforcement—a result contrary to Congress' intent to prevent the unapproved destruction of public housing.

■ Finally, the Court rejects HUD's contention that no private right of action exists under 42 U.S.C. § 1437p. We agree with the court in *Tinsley* that under the test promulgated in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), public housing tenants have implied private causes of action against HUD. *Tinsley,* 750 F.Supp. at 1008. *See also Concerned Tenants,* 685 F.Supp. at 319 (finding implied right of action under § 1437p). As the *Tinsley* court noted, several courts have held that in addition to a remedy under the Administrative Procedure Act, public housing tenants have implied causes of action against HUD under § 1437a, a provision of the Housing Act closely related to § 1437p. *See Id.* and cases cited therein. The court finds these authorities dispositive of the question.

## IV. *PLAINTIFFS' REMAINING CLAIMS*

In Count III, plaintiffs bring a claim against the HUD defendants pursuant to the Administrative Procedure Act ("APA") under 5 U.S.C. § 702. In Count IV, plaintiffs assert that the CHA and HUD defendants breached the Annual Contributions Contract ("ACC") between HUD and the CHA; the CHA, by failing to fulfill its obligations to plaintiffs, who are third-party beneficiaries under the ACC; HUD, by approving the *de facto* demolition of public housing units at Horner without lawful justification. Lastly, a pendent contract claim for breach of the tenants' leases is asserted against the CHA in Count V. A brief discussion of these remaining claims is in order.

■ As to Count III, HUD contends that plaintiffs' APA claim is not reviewable by this Court. We disagree. First, HUD says that plaintiffs have an adequate remedy against the CHA, thus precluding review under 5 U.S.C. § 704.[11] The court in *Tinsley* rejected the same argument. The court reasoned that given the pervasive regulation, close oversight and the funding provided by HUD to the housing agency, the agency "could not correct alleged problems to any significant degree without HUD cooperation, supervision, approval and funding." *Tinsley,* 750 F.Supp. at 1009. Under these circumstances, "[a] remedy directed only at [the authority] could be nearly worthless ..." *Id.* And, as plaintiffs aptly note, the argument presumes that in suing HUD plaintiffs

---

**10.** The Court does not consider defendant Lane's statements, quoted in the press after the tragic death of a young boy at Cabrini Green, as competent evidence of the CHA's intent to demolish public housing. While these remarks may reflect defendant Lane's personal beliefs about the best way to deal with the problems associated with high-rise public housing, when viewed in context, the quoted statements do not appear to reflect official policy goals of the CHA. Whatever probative value the statements have is probably substantially outweighed by the dangers enumerated in Rule 403.

**11.** That section states that HUD is subject to judicial review for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

are merely challenging HUD's alleged failure to enforce the provisions prohibiting unapproved demolition. This misconstrues the complaint, which challenges HUD actions that allegedly facilitated and encouraged the constructive demolition of Horner, like HUD's approval of the CHA's Comprehensive Occupancy Plans from 1989–1991 despite deficiencies in the vacancy reduction strategies outlined in the plans. Thus, even if plaintiffs obtained relief against the CHA, that would not remedy HUD's actions that allegedly contributed to the destruction of Horner.

Next, HUD relies on *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) to support its claim that the APA presumes immunity from judicial review of a decision not to enforce § 1437p. For reasons with which this Court agrees, the *Tinsley* court rejected this argument as well. The court noted that the presumed immunity of *Chaney* represents a "narrow exception to the overall presumption favoring judicial enforcement," which is applicable only when Congress intended to exempt agency action from such review. *Tinsley,* 750 F.Supp. at 1009. Noting Congress' explicit intention to provide a private right of action and that "[s]uch a right, by definition, is a right to obtain judicial review," the court concluded that "this matter is not within the narrow exemption from judicial review." *Id.*

■ The defendants' arguments with respect to Count IV—breach of contract under the ACC—warrant little discussion. The CHA defendants assert that if the ACC is construed as a "best efforts" contract or if the defense of "partial impracticability" is applied, they are entitled to judgment as a matter of law.[12] As it stands today, the record does not support summary judgment in favor of the CHA based on these defenses. Material questions of fact exist concerning the CHA's efforts to maintain Horner and whether inadequate funding is in fact the root of the problems at the Horner developments. At trial, with the benefit of a more

complete record, the Court will give these defenses whatever weight they deserve.

■ The HUD defendants' arguments with respect to Count IV are meritless. Defendants argue that plaintiffs are not third party beneficiaries of the ACC when this Court has already held that they are. *Henry Horner,* 780 F.Supp. at 515–16. The HUD defendants' other argument is that §§ 201 and 209 of the ACC impose duties on the CHA but not HUD. Unfortunately for HUD, plaintiffs' breach of contract count is not limited to those particular ACC provisions. Other provisions of the ACC refer to HUD's obligation to enforce violations of the ACC by the CHA. Sections 501 and 502 of the contract state that upon the CHA's substantial breach or default the CHA, upon HUD's demand, shall convey possession or title to the property to the federal government. This court is not alone in its conclusion that under the ACC tenants have enforceable rights as third party beneficiaries against HUD. *See Ashton v. Pierce,* 716 F.2d 56, 66 (D.C.Cir.1983), *modified on other grounds,* 723 .F.2d 70 (D.C.Cir.1983); *Tinsley,* 750 F.Supp. at 1012.

## V. *PLAINTIFFS' RULE 56(f) MOTION*

Plaintiffs filed a Rule 56(f) motion in conjunction with their motion for summary judgment. In their motion, plaintiffs describe three factual areas in which they have had inadequate opportunity to obtain discovery. As explained below, the Court believes that further factual development in one of the three areas cited by plaintiffs would aid the Court in resolving this case at trial.

■ The CHA defendants have asserted in their fact statement that between 1983 and 1991 the CHA requested $1.7 billion from HUD under the CIAP program, but only received $317 million. In support of their summary judgment motion, the CHA contends that this "funding shortage of $750,000,000" is an important factor limiting the agency's ability to meet the "unlimited demands and needs" of Chicago's public housing developments. This shortage of funds also undergirds the CHA's asserted defense

---

12. The CHA also asserts the partial impracticability defense against the pendent contract claim alleged in Count V. As with Count IV, the rec-

ord is not sufficiently developed to determine the adequacy or applicability of this defense.

of "partial impracticability." Plaintiffs contend, and we think with some justification, that unless they know the total amount of CIAP funds the CHA requested for Horner between 1983 and 1991, the CHA's request during that period of $1.7 billion from HUD for all its developments has no probative value. In short, the $1.7 billion figure needs to be put in context.

According to plaintiffs, the CHA has already provided the necessary information regarding CIAP funding requests for the years 1989–1991. Because the Court finds that the CHA's requests for funding under CIAP between 1983 and 1988 are relevant to this case, the Court will allow plaintiffs the opportunity to take further discovery on this issue.

For the reasons stated in footnote 10 of this opinion, the Court sees no need for further discovery regarding the statements in the press attributed to defendant Lane in late 1992. Nor is further discovery necessary concerning the CHA's rehabilitation efforts at Lakefront Properties. The similarities and differences between the CHA's rehabilitation efforts at Lakefront and Horner are sufficiently developed in the record before the Court. Given the differences cited by plaintiffs—the CHA's Memorandum of Accord with the Lakefront tenants and the establishment of a rehabilitation schedule there—the Court finds that the CHA's comparison between Lakefront and Horner is only marginally relevant to this case.